Case No. 16-1061, Susquehanna Int'l Group LLC and L Petitioners v. Securities and Exchange Commission Mr. Thompson for the petitioners, Ms. Hardin for the respondent, and Mr. Nissen for the intervener Good morning, Your Honors, and may it please the Court, David Thompson for the petitioners. At issue in this case is whether the SEC is anything more than a rubber stamp for the SROs at issue. The Options Clearing Corporation for decades operated as a public utility, and in 2015 they proposed a rule which would convert themselves into a for-profit monopoly under the APA if the SEC approved that plan. But under the APA, if it is arbitrary and capricious or if it is contrary to law, it must be stricken, and it is both. It is contrary to law for a number of reasons. Number one, the SEC is under an obligation to ensure that investors are protected, and here the SEC did nothing to assess the rate of return. They blindly deferred to the rate of return. In fact, we don't even know what the OCC thought the rate of return would be. It is not in the record, number one. Number two, we are told there was a need for immediate capital, but again, there's no analysis of why did they need the capital immediately, particularly when they were designated a so-called systemically important financial market utility in 2012 and for 18 months did precisely nothing and then took nine months to study it, so two and a half years they took to study this question, and then they say, well, we need to do this immediately, and at the same point they had hundreds of millions of dollars of excess fees that they had retained and which were immediately available. There is zero analysis of why that alternative would not be sufficient. In addition, the SEC was under an obligation to determine whether the plan was, quote, consistent with promoting competition, and they admit that they did not consider that. They said, well, we considered the separate question of whether there was an undue burden on competition. That is clearly a distinct inquiry. You could have a cartel where the members are cheating on each other in their quotas, and it's totally ineffectual, it doesn't have a big burden on competition, and yet it has no pro-competitive attributes whatsoever, so these are distinct questions, and they looked at the one, but they did not look at the pro-competition. And, you know, critically, so that's why it's contrary to law, but if we switch to whether it was arbitrary and capricious, did they look at, quote, the relevant data? Did they provide a cogent explanation for the decisions they made? There are a number of critical issues where they did not. Rate of return, no cogent explanation, no relevant data. The notion that there was a need for immediate capital, I addressed that. $130 million capital buffer, so they had the six months, that's $117 million of capital. There is no explanation in this joint appendix, in this record, as to where the $130 million of extra capital that was allegedly needed, how that was determined. We are told that they did not expect the fees to increase. They looked at the wrong, first of all, there's no empirical data in this record on that question, but second of all, they seem to have looked at gross fees rather than net fees. Gross fees, that's not the relevant metric. If somebody is paying taxes and having $10,000 withheld and gets a $10,000 refund in one world, and then in the next world they pay $5,000 or withheld and they get no refund, they don't think they've gotten a tax cut. They're looking at the net number. The SEC looked at the gross number. If they had looked at the net number, they would have seen it necessarily follows that the net fees were going to increase. And they had no discussion of that in the commission? No discussion, Your Honor, and at the risk of doing a little bit of math without a whiteboard behind me, let me just say that, just let me walk through why it is true that it necessarily means that the net fees will go up. Under the prior regime, they say there was a 31% capital buffer, which they grossed up. So let's say there was $100 of expense. They said we would charge $144. That's 31% grossed up, $144, and then they would refund all of the excess, the $44. And so the net charge to the customers would be $100. Under the new regime, they say, well, the capital buffer is lower. It's $25. So they gross it up to $133. That's the amount of fees that will be charged. They say, oh, that's less. But there's only $16.5 of refunds because the other $16.5 goes for dividends. So it is a mathematical fact that is incontrovertible that if the fees, that the net fees will go up. There was no discussion at all of the differential treatment of the $72 million of retained capital. So this plan is $150 million of capital from the incumbent, Oligopolis, and then $72 million coming in. No return provided whatsoever on that $72 million of capital infusion, which came from the clearing members. They failed to address key alternatives. One of them was, well, maybe the non-shareholder exchanges would put it in capital. And this is really critical. I would urge the court to look at Joint Appendix, page 85, footnote 10, where the OCC says, you know, we only look at alternatives that would benefit the incumbents because we don't think they would agree to any changes that wouldn't benefit them. That's a decision they made, but it is not rational for the SEC. Can you do that page again? Sure. It's Joint Appendix 85, footnote 10. And what it speaks to is essentially the veto power that these five members of the board. One of the things they've said is, well, we're only five members of an 18-person board, but it's like dealing with the permanent members of the U.N. Security Council. They may only be five votes on that council, but every one of them has a veto. And so these five were deemed to be the OCC said, we're not going to propose anything that might not be in their interest because that would run counter to their veto authority. They also didn't look at the ability to do a sunset provision. Even if there was an immediate need, even if the massive retained earnings couldn't meet the need or the non-shareholder exchanges, you could have put in the capital and then paid it back. That's what people do when they get expensive capital. I'm sorry, but what was the J.A. page? Oh, it's 85, Your Honor. 85? Yes, J.A. 85. Okay. Footnote 10. Yes, Your Honor. So people in the real world, if they have to take immediate capital on, and it's expensive capital, they refinance. They don't lock themselves in perpetuity to a plan. If there's an opportunity to get lower cost of capital, they do that. And then one thing which they admit they made a mistake on in the order is this idea of replenishment capital. And in the order, they misdescribe it. And then they say, well, we understood it at other times and places. Even if that is true, there is zero analysis as to what is the right rate of return for that. That is a separate product. It is a separate financial instrument, just like a home mortgage equity line is different from the underlying mortgage. This was essentially a line of commitment, a line of credit, no analysis as to the market data. So really for all these reasons where we have no explanations, no relevant data, no articulation of the alternatives, for these reasons, Your Honor, we would submit it should be struck down the plan and remanded. Let's start with the ending, struck down and remanded. You asked for vacatur.  I apologize for being precise. That's all right. Don't you agree that if we were to do that, it would be a logistical nightmare? I don't, Your Honor, because we could do the sunsetting the piecemeal, so the temporary. So, for example, if they've got the $247 million of capital now, they could simply keep that in place but pay it down as excess fees are generated. Don't you think that it would be implausible that the highly financially sophisticated exchanges and members would be able to address all this bookkeeping, tax-related issues involving unwinding? No, I think they could have figured that out, Your Honor. Didn't you take the opposite position in your motion for a stay? I'm quoting from your motion for a stay. You don't have the same trick for the other side. Okay. Your Honor, I will confess. I know it's not your firm, but you took the position there you had to have a stay because it would be a logistical nightmare to try to unwind it afterwards, and it would be impossible to address these problems and that the others are going to be outside of our jurisdiction, all those things. I'm asking whether this is, you know, our court has some analysis as to whether vacatur and remand is appropriate in circumstances or whether remand alone would be appropriate. This, of course, assumes you win for the moment, but we're at the end of your argument, so I thought I'd ask you that. Isn't remand a more appropriate issue here for the SEC both to reconsider in light of the errors in its judgment that it made, most of which, as I understand them, are errors of not actually looking at the data rather than reaching a wrong conclusion, and then after they look at the data, maybe come up with some modification or something? Well, certainly we'd rather have a remand than an affirmance, Your Honor, but in terms of let me just speak to that logistical question. It would be difficult to go back to time zero and unscramble whatever dividends they've received, and I don't think that would be necessary. I think to simply say let's go on a separate path where we pay down this very expensive capital by retaining earnings and fees and reducing it, that that would be an easy way to remedy the problem that we're seeing. Okay, are there other questions? Okay, we'll hear from the SEC. I know you don't want to start with what happens if you lose, but let's start with that since we were just on the same thing. Now, in your opposition, you say it's implausible that the highly financially sophisticated exchanges doing the distributions would be made, would be unable to address any unnecessary bookkeeping and any unwinding. It might be complicated, but not impossible. Do you think that the appropriate result if you lost is vacating or merely remanding, and why? I think it depends a bit, Your Honor, on what the basis of the court's finding is. If the court's finding is that the commission's analysis under the APA fails to satisfy recent decision making, then that is something that may be able to be addressed on remand. If the court's finding that substantively the plan itself is contrary to law, given the statutory scheme we're working under here, the commission doesn't have discretion to alter the plan. That's something that would have to go back to OCC. And so in that case, there's very little that could happen on a remand other than just going back to OCC. And in that instance, as we said in our state papers, we do think it could be worked out. As you allude to, it may be complicated, and it may require a suit. So if we remedy it all, then we have to remedy by vacancy? No, Your Honor. If we just remand, nothing's going to happen? No, I'm saying it depends on the basis of the court's decision. If the court finds ultimately that the commission's analysis was insufficient, certainly the commission can remedy that on remand. We, of course, submit that the commission's analysis was submitted sufficient, particularly given the context we're working in here. Congress has set up a scheme where SROs do have discretion to conduct their business so long as their decisions meet the baseline requirements in the Act. And what the commission looked at in this order was that key question, does this meet the baseline requirements of the Act, and the commission independently analyzed those questions. This is the problem I'm having about the independent analysis. So this is going to be long, but I think this is the best way to do this. Could you pick up the order itself? And I'm just going to go page by page. Really, the bottom line question of every question is, was there an independent analysis, or did they just accept what OCC said to them? So the first question, and not all the questions are those, but I just found it easiest to organize myself around the order. If you look at JA-689, in that complete paragraph at the top, the sentence is, however, OCC will not resume paying dividends and will recalculate how dividends are made from within 24 months replenishment. Now, that's an incorrect statement, correct? That's correct, Your Honor. That is mistaken. So how do we know that the SEC was working off the correct analysis on what seems like a pretty important point? Well, I want to take that last statement first, Your Honor, is that we should put this particular aspect of the plan in context, which is that it only comes into play in what everybody agrees are highly unusual circumstances. And so unusual, in fact, that the petitioners didn't even raise this feature of the plan in their petitions for review to the Commission. But to take your first question, how do we know that the Commission understood this aspect? I think there's a couple of other places in the record we can look for that. Of course, later in the order, when the Commission's talking about the dividend policy, there's a footnote that indicates the Commission is aware that dividends can be calculated when the refund policy has been eliminated, and therefore set to zero. Which one is that? Sorry, Your Honor. It is note 48 on JA 688. So just the prior page. That's the refunds, right? Right, but that's the point. The Commission is talking about how you calculate dividends when refunds have been eliminated. So it indicates that the Commission is aware that that eventuality can be calculated. Not of that particular point, Your Honor. Just to finish up with Judge Garland's question, this is also appropriately and correctly described in the Commission's notice at the beginning of this process. Yeah, so that's the notice at JA 10. Is that right? And the particular place is at the very end. You mentioned only one. Yeah, so it would be on 24 and 25. Yeah, I don't see anything on 24. I see the very last sentence of the part on 25. Is that what you're talking about? If replenishment capital has been contributed and remains outstanding, OCC would not pay dividends until such time as the target capital requirement is restored. Is that the sentence? Yes, Your Honor. So it's only that very last clause, until such time, which suggests that there will be a time. But this is all in a section of this notice, which is described at JA 10 as coming from OCC. And they prepared that section, right? That's what it says, which has been prepared by OCC. That's correct, Your Honor. I do want to point out on JA 24, it describes that refunds will be eliminated. Yes. And that's also correctly described. Their argument is that refunds are eliminated but not dividends. That's their complaint, right? That's correct. And the notice, this description and summary of the plan is prepared by OCC, but this is a commission document. The submission comes in and it's published two weeks later. This is a commission-prepared document. And to get to Judge Sentelle's point about the analysis of this issue, I think what the record shows is that the commission was aware of this feature. It nonetheless found both the dividend and the refund policies to be reasonable and consistent with the act. Whether or not an analysis was required under the APA of this specific feature goes to the significance, again, of this feature under the plan, which comes up, again, only in highly unusual circumstances. And, indeed, there's evidence in the record that explains why this feature exists in those unusual circumstances. We're talking about a situation where the initial capital contributions have been depleted, there's been replenishment capital called, and OCC has insufficiently recovered over a period of two years to repay that replenishment capital. And it's not unreasonable to alter the compensation for these capital contributions in those circumstances where the risks to the contributions have proved to be much greater. All right. Can we look at JA697 footnote 84? It says, OCC engaged an outside consulting firm to develop capital needs and targets and a financial advisor to provide analysis on dividend returns. Does the SEC know who the consultant is? That's not in the record before the court, and it's not relied on in the commission's order. All right. And has the SEC seen the analysis? Again, the commission didn't rely on that analysis in its order, and so it's not in the record before the court. Okay. I do want to note, however, that what we're talking about here is the dividend rate, and this goes to, of course, one of the arguments that petitioners raised, that the commission had to put a precise number on that dividend rate. Well, it's not clear it had to put a precise number. It at least has to make a reasonable, determine whether it's reasonable. And the question is, did it do? If it doesn't even know what the analysis that was used to formulate it was, and it doesn't even know what the number is, how can it say it's reasonable? A couple of things, Your Honor. First of all, the commission did note the estimates in the record, but you're right. It didn't rely on what the precise range is, and that's because it rationally relied on two other factors. The first is that the dividend rate was negotiated between essentially adverse parties here. It's negotiated between the shareholder exchanges and members of the board who represent clearing members, and that is the stakeholder group most directly affected by the size of the dividend. Do the five members who are shareholders, are they recused from the decision? No, Your Honor. That's a separate question that hasn't been raised on appeal. Well, it's raised on appeal in the sense of whether you make an argument that this is an arm's length agreement. That is not mentioned, by the way, in the order. That's what you say in the brief, that it was reached at arm's length. I'm having a little difficulty seeing how it's arm's length if five members are on both sides of the arms, and also they appear to have a veto power. A couple of things, Your Honor. First, there are financial interests on both sides of this question on the board. Certainly the directors representing clearing members have an interest as well, particularly when the board voted on this, it was considering the plan alongside an option of retaining earnings, which would probably entail an increase in fees and certainly a decrease in revenues. So there were financial interests on both sides of the board when this was considered. Well, that suggests it's not arm's length at all. Everybody's on both sides. Well, no. This is not what we normally consider arm's length. Well, two things, Your Honor. The negotiations are between parties with divergent interests, right? The clearing members have an interest in maintaining fees and refunds at a level that they would prefer. The stockholder exchanges have an interest in the dividends, and so you have essentially an adversarial process there. And then you have a two-thirds majority of the board, including four clearing member directors and two public directors who voted in favor of the plan, in contrast to the retained earnings point. And so what the commission is essentially relying on here is that the process is likely to yield a reasonable result. I see. So whatever OCC comes up with is reasonable. Is that the answer? No, that's not the answer because the other thing the commission relied upon here is the structure of the dividend policy and the fee policy and how the components of the plan work together to constrain dividends going forward. So if you don't have both, then you might have a different decision by the commission. But it's rationally relying on both. And I want to get to the brief. Where is the best discussion of the fee question? You're telling us they relied on that analysis also. Where did they analyze that? Well, the discussion of relying on the components of the plan would be at 705 and 706 of the joint appendix. And what we're talking about here is that the plan establishes this 25% business risk buffer and sets fees at expenses plus the 25% buffer and reassesses fees quarterly to ensure that you're not going above that buffer. And that acts to constrain the possibility of excessive dividends under the policy. And ultimately, it's important to remember here that the question before the commission was, is the plan as presented an inappropriate or unnecessary burden on competition in light of both the alternatives available and the significant interest under the act in having a well-capitalized OCC? So this is a balancing determination by the commission, as this court expressed in Bradford. And putting a precise number on the dividend rate in this context, in this case, wouldn't have materially changed the decision before the commission. Because you have a situation where the commission looked at the alternatives available. There were reasons for not pursuing those alternatives. What if the dividend rate were just so obviously so high that no human being could consider it reasonable? Isn't it necessary for the SEC to at least look at them to find out what it is? But the commission did look at it at the level you're talking about, Your Honor, right? The commission noted the estimates in the record. The estimates made by the OCC, right? Estimates made by the commenters, both the commenters and OCC. But the commenters didn't have any information about the actual underlying analysis by the financial consultant or anybody else. Again, I want to push back on that. Because what everybody had available to them, the commission and the commenters, is the structure and formula that's going to be used in setting dividends going forward. And that's well set out in the notice and additionally in all the comments. And that is, in fact, what the commission is approving here, right? Dividends are not guaranteed every year. Dividends will vary every year depending upon, as the commission noted, a number of circumstances. And so the commission's looking to the structure for setting that dividend rate. Say again the structure. The structure's all based on the 25% buffer. That's what you mean by structure? I mean the structure of the entirety of the plan, Your Honor. And so the structure of the dividend, yes, is set sort of in conjunction with the fee and refund policies, right? We have the 25% buffer that caps whatever excess revenues could be. We have the refund policy, which pre-tax gives half of those revenues back to clearing members. Then tax is paid, and then you have the dividend paid. And so everybody knows precisely how this dividend's going to be calculated every year. The only thing not in the record are OCC's internal deliberations to put a number on each of those in the first instance. And again, in the SRO structure, where the SROs do have flexibility and discretion to conduct their business, it's not inappropriate. The problem here is to what degree can the SEC simply accept what an SRO has done, and to what degree do they have to analyze it themselves to find out if it's determined to be reasonable? Aren't they obligated to make an independent decision? Of course, Your Honor. And we submit that the commission did exactly that here. There's only a few things in the record that the petitioners point to saying the commission should have looked behind. But again, we're talking about the precise numbers of the target capital rate, the structure and formula for developing it were well laid out in the notice, and in fact is consistent with rules the commission has since adopted. We're talking about evaluation of alternatives, which, again, the commission does not have discretion in the context of approving an SRO rule to choose between alternatives or to even alter the plan presented so long as it meets the baseline requirements of the Act. In that circumstance, where the commission is just looking to see whether the presence of alternatives renders the proposal inconsistent with the Act, it's not unreasonable not to go down the road of quantifying incremental differences in benefits and burdens between all the alternatives. Can I? I have the general point.  On page 701, it says the board determined that the historical practice of solely using fees with annual refunds to cover operating expenses and managing risks did not allow OCC to reach adequate capitalization. Is the SEC's determination based solely on the board's determination? No, Your Honor. The commission separately looked at the proposed alternative of retaining earnings, and it found that there were good reasons for not pursuing that at the time the board made this decision. The commission looked at the fact that that accumulation of capital would not be as expedient and the fact that it doesn't include a replenishment capital commitment. And both of those are reasons that render OCC's determination to pursue this plan as opposed to retain earnings a reasonable one and not inappropriate or unnecessary in license of the further use of the Act. Yes, but this sentence is just about that this did not allow OCC to reach adequate capitalization, not whether there was a better plan or not. Did the SEC actually determine on its own or even by reviewing the analysis of the OCC that the historical practice would not allow the OCC to reach adequate capitalization? What the commission noted and looked at was the fact that the board determined it would take either an increase in fees, about to 162 percent, or until mid-2017. That's what the OCC determined. And the commission reviewed that analysis and found that it was reasonable not to pursue that path given the problems with it. When you say they reviewed the analysis, you mean they looked at what the OCC said or they did something else? The commission did not recalculate those numbers. And they didn't even look at what those numbers were? How those numbers were calculated? Well, what the commission had before it was the discussion and the comment of what those numbers were, right? OCC represents in the comment that it has $150 million in capital as of August 2015. And the commission noted that analysis and noted that the petitioner's contentions with respect to whether retained earnings would accumulate sufficient capital in an expedient fashion, A, don't get you to the full capital commitment, and appear to incorporate things that OCC disagrees with. As laid out in the comments, they don't even take into account taxes. So the commission looked at the evidence before it in the comments and from OCC and reasonably determined that at the time the board made the decision, it had a good reason not to pursue retained earnings. And indeed, it's laid out in the comments that that option is not without its own complications. I mean, when OCC originally determined to retain earnings here to raise capital, market makers objected and said, no, no, no, you have shareholders. They should bear part of the cost. Ultimately, what we're talking about are tradeoffs made by OCC in determining to pursue a particular path. And the commission's role under the SRO process is just to determine whether the path chosen was consistent. Why was a 50 percent of the excess fees going to the shareholders? Why was that reasonable? Your Honor, I think it's important to look at what the petitioners are arguing, that this somehow renders OCC a profit-taking monopoly. No, that's not what I'm asking. I'm asking why this makes us a reasonable return on their investment. That's what I'm asking. On the- On what way does the SEC determine? For many points here, the SEC says, The components of the capital plan are designed to set the dividends to be paid at a level that the board, with the assistance of independent outside financial experts, has determined to be reasonable for the costs and risks associated with their contributions. I understand that the OCC believes that, and their independent financial experts determine that it's reasonable. But if the SEC doesn't look at the reasoning, doesn't look at the analysis by the independent financial, or by the outside financial experts, whether they're independent or not, we don't know, how can it make that determination? The order is just replete with this. The next page says, The commission believes that the various components operate to set reasonable dividends. But again, I don't know how you can know what a reasonable dividend is, unless you look at at least the financial analysis used to determine the cost of capital and the risks. Well, a couple of things. Again, the commission is relying on the process of the board went through to come up with what is a reasonable rate. And there's a reason for that, not just because- other than hiring a financial consultant who looked at it. Again, negotiating between the clearing member directors and the shareholder directors who have adverse interests here, and the approval of a two-thirds majority of the board, including clearing member directors and public directors. But that does suggest that the SEC is saying, look, we think the OCC is set up in a fair way, and whatever results they come up with are going to be fair. Is that right? No, Your Honor, because the commission's looking at the board process, saying that that is a process set up to essentially come to an adversarial determined compromise rate and the structure of the plan, which is what it's approving here. What the commission said is that the process set up came to what the two-thirds majority of the board considered to be the best transaction possible under these circumstances. They trust those adversarial negotiations in the context where, you know, there's no good analogy here for what a rate of return would be on a capital contribution to OCC. Well, the SEC doesn't say that. I could almost get it if they say this is just too hard, although we have another case in which we say the SEC saying this is too hard is not good enough. The SEC still has to do its own analysis. But that's not what they said. They didn't say that's the reason we're doing this, this is too hard for us. They just didn't do it. No, but the commission noted the unusual circumstances, right, and the unusual nature of this capital contribution, and given those unusual circumstances and the fact that the board set up a process that is likely to lead to a reasonable rate, it's rational in this context, in the context of the review of an SRO rule. Your Honor notes cases in which the court has said, well, the SEC has to do the best it can, but those cases all talk about what the determination the commission is making there. Certainly when the commission is choosing among options, you might expect a greater degree of analysis of the precise incremental benefits of burdens between those options. But that's not what the commission's doing here. Ultimately, this comes down to an argument about the commission's finding that this is consistent with a portion of 17 cafe, that an SRO rule not impose a burden on competition that's not necessary or appropriate in furtherance of the act. How do you distinguish the net coalition case? In the net coalition case, what the court found the commission should have looked at was evidence to substantiate assumptions it was making about the current competitive nature of the marketplace, and those were things that were not self-evident and, in fact, appeared to be contradicted by other parts of the commission's analysis. Here, the reasons for rejecting alternatives are not pursuing alternatives. Here's the language. The self-serving views of the regulated entities provide little support to establish that significant competitive forces affect their pricing decisions. That's right, Your Honor. The key part of that sentence is provide little to support the competitive nature of that particular marketplace, and that is something where you would expect to see quantification. Here, the reasons for not pursuing these alternatives did not require precise quantification, and the commission's qualitative discussion of those reasons was sufficient, and this court has made clear in a number of cases that quantification is not always required, and qualitative discussion can be sufficient depending upon the nature of the decision being made here, and the decision being made here did not require that degree of precise quantification. Any questions? Thank you. Thank you. The OCC is up. May it please the Court, my name is William Nissen on behalf of the Options Clearing Corporation. Your Honors, one thing that's kind of been lost here today, I think, is the importance of a well-capitalized OCC. OCC has been determined to be a systemically important financial market utility. We haven't heard anything about that today, which means Maybe the reason we haven't heard anything about it is it's not material with the issues before it. Well, I think it is, Your Honor, because I will assume it's very important. Yeah. And I think that you can't take forever to put in force a rule that will well-capitalize the OCC. I think that's the relevance to it. As it was, it took over a year to get the final approval of this plan through the SEC with the administrative proceedings and so forth. We were able to put the plan in effect in September 2015 because the SEC had vacated the automatic stay. And just in terms of the question the Court asked the SEC at the outset about if you lose, what should we do, I would like to address that. Please. Am I saying please? I don't mean to suggest you're going to lose. No, I understand. But I do want to say it. I mean, could it be done, unscramble the eggs? I suppose so, but it would be extremely disruptive. And I think that's relevant also to OCC's extremely important role in our financial system. And in addition, the arguments that the petitioners have made are arguments that could be cured. Well, what their main argument is, is there's not enough support for this. And I think that the I think their fundamental argument may be that the Commission did not explain, its reasoning did not provide an independent review. More bluntly put, that they think they're rubber-stamped what they're expressing. Right. Yeah, I understand. That is their argument, Your Honor. Based on that argument, I think that giving the SEC another chance would be far preferable and much more responsible for our financial system. There's another argument behind that, isn't there? And that's the suggestion that something nefarious is taking place here, right? That we've gone from a public utility to a for-profit entity, and that it's the shareholders in OCC who have done this. Are you here to address that? I would, Your Honor. Yeah, there's nothing nefarious. The veto power that was talked about, I mean, that was put into OCC's bylaws with SEC approval many years ago. So that's what OCC had to work with in terms of coming up with this plan. And as counsel for the SEC said, there was a negotiation between the clearing member representatives on the board and the exchange representatives on the board, each of which has opposing interests. That's why, I mean, OCC is unique, and I think it has a unique structure. And I think that's very important here as to how they came up with it. So there's nothing nefarious. There are competing interests within OCC in order to achieve the public interest because they are a regulated entity and they are important to the financial system. So there's nothing nefarious. There is a group of clearing members that has an interest in maximizing refunds. There's a group of exchanges that have an interest in what they believe is fair compensation for the investment they're making. And those two work this out, and then it was approved by two-thirds of the board, 12 out of 18, including public members of the board who have no affiliation with anybody in the industry. And all of these directors have a fiduciary duty to OCC, even though they represent certain interests. So there's nothing nefarious going on. This came about through a give-and-take of a structure that was set up to represent the industry so that I think in terms of the SEC review, there's less need for an independent SEC review in this particular situation than there might otherwise be where you would have. For example, if the five shareholder exchanges, like a traditional corporation, control entirely that corporation, that's not the case here. They're only five out of 20. Certain areas, they do have a so-called veto where they have to all agree upon it. But otherwise, it's the give-and-take of all these different interests. And so there's nothing nefarious going on here. I see the time is up, unless the court has any other questions. We would request that the court affirm the SEC's order, and alternatively, if the court didn't, that you remand rather than vacate. Thank you. Thank you. Is there any time left? Just very quickly, Your Honor, it's helpful if you obviously responded to the SEC's argument, one, that the refund feature isn't significant and, therefore, doesn't make it arbitrary and capricious. Could you say that again, sir? I apologize. She argued that because the end-to-refunds provision only occurs under extraordinarily unusual circumstances, it's not significant enough to make the plan arbitrary and capricious. That's just sort of one very narrow thing. And then, more specifically, on the idea that the structure and the formula for determining the dividend rate is sufficient to make the plan, or at least that part of the plan, reasonable. Happy to do so, Your Honor. On the first point, they do say that the replenishment capital provision, they say, is, quote, highly unusual. But if we look at page 705 of the joint appendix, they point to the committed capital as one of the bases for why the return is reasonable. They can't have it both ways, Your Honor. They can't both, in the one sentence where they purport to justify this, invoke it, and then, on the other hand, say it's extremely unusual. And this product, Your Honor, is really like an insurance policy. And so if it is extremely unusual that it will ever be called upon, then the rate of return for it should be very, very small, Your Honor. So it actually really works against them that it's an extremely remote circumstance in which the companies will ever be called to put this money in, would be one response, Your Honor. In addition, they do suggest, well, you know the formula, so you know what the rate of return will be. The formula is very pernicious, Your Honor, because what it says is the more they increase their expenses, the more profits they make. If they double their expenses from $100 million to $200 million, they will double the rate of dividends that they receive from $16.5 to $33 million. And so we don't know anything about what they project in the way of increased expenses. We do have some historical data on that where we can see on JA58 that the expenses have exploded from $165 million in 2013 to $234 million in 2015, precisely what you would expect if monopolists were increasing expenses to increase their profits. And in terms of nefariousness, the other thing we haven't touched upon is the failure to provide notice to the non-shareholder exchanges. There is not a single non-shareholder exchange on the board. And the bylaws say that if something is of competitive significance in the view of the executive chairman, he is to give notice. He did not do this to the other members of the industry. So we don't know enough to calculate the rate of return because we don't know the expenses. So when she says that the industry is represented on the board, you're saying that none of the non-shareholder exchanges have any vote on the board at all? Right. And they're supposed to be given notice if something impacts them. That's because they're not on the board. That's why you would have that provision in the bylaws saying we understand we do need to give notice. And that was circumvented. And the notion that this would not have competitive significance, if anything would have competitive significance, this sort of plan would. Your Honor, we would respect what he suggests. Questions? All right. Thank you. Thank you. Very good arguments again on both sides. We'll take them out under submission.
judges: Garland, Griffith, Sentelle